COCHRAN Good morning, Your Honors. Thank you for hearing this case. My name is Bill Cochran, and I'll be speaking on claim construction. This is my colleague, Gordon Hatfield, and he will be speaking on the motion for summary judgment of that decision. And he's going to describe how Colgate, in the words of the magistrate judge, lied in the interrogatories and how that resulted in prejudice against our client. And he will also describe the decision, how that decision was improper, and even assume the arguendo that we do not get our claim construction, that decision was still improper. So, with regard to claim construction, I'd like to say that this is a pretty simple case. This is a matter of construction of the claim term, plaque removing member. This is a term that was defined specifically and clearly in this patent specification. And it was defined as a mixture of relatively soft elastomeric materials such as silicon rubber, a thermoplastic elastomer, or other materials having similar characteristics and particles of an abrasive material. That's in the written description. That's in the patent in the written description. But we don't incorporate that necessarily into the claims unless the claims call for it. And claim 1 specifically states that the plaque removing member is formed from a mixture of relatively soft elastomeric material and particles of an abrasive material. So, we have this defined in the specification. It's in claim 1. And it's a basic tenet of patent law that a And this is a long-standing rule of the court. Dr. Asher has been his own lexicographer in this case. He has defined the term plaque removing member as a mixture of an elastomeric material and abrasive particles. Colgate and the district court's opinion on this, their interpretation, was that the plaque removing member means particles of an abrasive material in sufficient quantities and disposition within the rubber member as to have an abrasive effect on the user's teeth or gums. But isn't the problem just simply that they felt that with the presentation of the case saying that particles such as titanium dioxide and others that are known abrasives nevertheless had to have been shown by you on behalf of your client at the threshold as being abrasive rather than, as they say, just whitening? Well, that gets into the issue of infringement. They always said that the threshold of presenting your case hadn't been made. Well, more specifically, what they argued, what the court said, was that the name plaque removing member required that the elastomeric remove plaque because of the name. And otherwise... Right. And they said that the term plaque removing member would thus thereby be functionally meaningless as was the term of the district court. But our response to that is that I can call this anything I want. I can be my own lexicographer. I can write this patent and I've specifically defined it in the specification and I've put it in Claim 1 that it's elastomeric material with an abrasive material. Now, there's no dispute that in fact Colgate's product had abrasive material. It's just a question of whether it actually abraded. Is that correct? That's correct. Okay. So... And Mr. Hadfield will talk how we were prejudiced. Do I understand that the parties are in agreement that this claim construction issue wouldn't necessarily define infringement, but it would certainly define this appeal, determine this appeal? That's correct. If we agreed with you, then we'd have to send it back for further consideration of whether or not there are abrasive materials in their product. Right. And if you look at their definition where it says that the abrasive materials are in sufficient quantities and disposition... That's the court's definition. Correct. Yeah. Correct. And the exact assertion of Colgate that it would have an abrasive effect. Well... You don't think an abrasive effect is called for by Claim 1? Exactly. It's not in there. As a matter of fact, there's nothing in the entire patent anywhere that would talk about this idea of insufficient quantities and disposition within the rubber member. How would you have... It causes an abrasive effect. This is... How would you have at least one plaque-removing member if you don't have some abrasive effect? Is there some other way to remove plaque? Well, the invention relates to the toothbrush. The invention is not the plaque-removing member. And the toothbrush, all inventions relate to combinations. It says a toothbrush comprising at least one plaque-removing member. Right. So, I'm puzzled as to why there's... Well, there's bristles... Why you don't require at least one which implies something that will remove plaque. Right? It straightened me out. I don't understand. Okay. Well, this doesn't conform to any known claim construction rules that I'm aware of. That you're arguing, well, that's a plain meaning of the claim. But if you have a definition, that changes the plain meaning of the claim. And we have this as a defined term here. So, you're saying that plaque-removing member, we don't have to analyze whether or not it actually removes plaque. We just have to analyze whether or not it satisfies your definition in this fact. Exactly. And we're urging you to follow the long-established rules of allowing us to be our own lexicographer. Now, they cited a case here, the Laringeal case. I don't know if... This was a case from the Federal Circuit in 2010 that related to a collar that was attached to a plate for an esophageal tube. I don't know if you're familiar with this case, but in that case, this was just a description of the way the device worked. And the defendant in this case tried to say, well, in describing how the invention worked, they defined that term. What am I to make of column 3, lines 4 through 6, where it says, each plaque-removing member is preferably formed from a mixture of an elastomeric material and an abrasive material? What am I to make of that? Well, that's the specific definition. That's where we define the term. And an abrasive material. And an abrasive material. These are abrasive particles. They're mixed in with the elastomeric material. And that's the way we define this. What's the purpose of the abrasive material? Well, again, we're going back to a situation where we have a claimed, we have a specific definition here. And a specific definition always trumps the plain meaning of the term. Yeah, your definition is of an abrasive material. And the purpose of it, the abrasive material has no meaning, is that what you're saying? Could be any molecular abrasive material? Well, these are small particles. Any one little molecular abrasive material would defeat them. Well, you know, I mean, their testing showed that, yes, there was an abrasive effect of a toothbrush. Now, do we want to turn some time over to Mr. Hatfield? We've diverted you with this issue. He doesn't have much time left. But you can try. May it please the Court. Thank you, Your Honors. So let me delve now to the specific facts that support Dr. Asher's assertion that, in fact, the polishing star in the toothbrush had an abrasive effect on plaque. So as this Court knows, it reviews the granting of summary judgment de novo. So the facts that we've spelled out in our briefing, I think, clearly show that there are genuine issues here. Number one, the advertising itself on the toothbrush says it removes stains. It says it polishes. In our minds, it's simply impossible to polish something or to remove a stain without some abrasion of the object that's polished, in this case, a tooth. What is the real issue in this appeal? Is it whether, in fact, that this patentee was entitled in some sort of rebuttal to provide expert evidence with respect to abrasive material? Or are we bogged down entirely on the technicality of whether, at the presentation of the case, it was inadequate?  Well, Your Honor, what we are asking you to decide is, first, did Dr. Asher present sufficient evidence to avoid summary judgment? Without the expert? Exactly. Even without including Dr. Newman's report. He presented no evidence without the expert. Well, Your Honor, we don't agree with that. We have the expert report of Dr. Self, who stated that the particles were inherently abrasive. Therefore, they would abrade. This was also reaffirmed by Dr. Asher. And I want to focus a minute on Colgate's argument that, and actually the assertion of the district court as well, that all Dr. Asher proved was the possibility of abrasion. Well, in ruling on motions for summary judgment, Dr. Asher is entitled to all reasonable inferences that can be drawn from the evidence. Here we have significant evidence, even without Dr. Newman, that the polishing star had an abrasive effect. In fact, it would be puzzling that Colgate would even include such a elastomeric member if it had no effect on a person's teeth or gums. Colgate's own design expert, this is Al Sperasta, stated that the polishing star was designed to remove plaque. This is an admission by Colgate, designed to remove plaque. Another one of Colgate's agents who was deposed, Douglas Holbein, stated that plaque is a relatively soft material. Is there any way to remove plaque other than through abrasion? That is the question. That is the question. What's your answer? Do you know? Put it the other way. Do you know of a way to remove plaque other than through some abrasive material? Your Honor, this goes back to a long-standing debate we had with the district court. Is there a difference between polishing and abrading? Does polishing necessarily contain an abrasive act? And our answer to that is yes. It necessarily requires abrasion against the tooth to polish it. The bristles themselves will abrade the plaque because it's soft. So will the elastomeric member. Therefore, in our minds, abrasion is inherent in polishing, in a wiping motion. It's another description of how plaque is removed. It's necessarily abrasive. All right. We'll save your rebuttal time. Let's hear from Colgate-Thomas. Mr. Callahan. Good morning, Your Honors. One thing to sort of pick up on the point where counsel left. There is another way to utilizing a toothbrush to get plaque off a teeth. It's called toothpaste. Toothpaste has got abrasive particles in it. So one of the things you can do and what the Colgate brush does and what the witnesses were talking about, as shown in the record, is that you put an abrasive toothpaste on the toothbrush. That forms a slurry. You then can take the elastomeric member, rub the slurry against the tooth and thereby remove plaque. It's sort of the fundamental way that toothbrushes work with toothpaste to remove plaque. You're telling us that the product that Colgate has produced, which is charged with infringement, is redundant or unnecessary or just use our toothpaste? No. I'm saying, Your Honor, if you take a look at the 011 patent, in Column 2, Asher specifically describes as prior art to his patent, U.S. Patent 5040260. This is in Column 1, Lines 25 through 27. It's also, Your Honor, described by Judge Plager, right below the section of Column 3 that you noted. The 260 patent has elastomeric members. What Asher says is, I don't think that works. I don't think it helps remove plaque. So what I'm saying is, in addition to the elastomeric member, I'm going to put abrasives into it. And the abrasives at the external or at the surface of that elastomeric member are what, in Asher's contention, help remove plaque. How do we know this for sure? Wouldn't that go to the question of whether it may have been obvious to create an elastomeric member that has just abrasive particles if they don't otherwise have an abrasive effect? I mean, that's different from asking us to read into these claims limitations that say that they must have a functional effect because it's not functional claiming that we're looking at. It certainly has something to do with obviousness, Your Honor. That's an issue the district court didn't get to because of its ruling. However, in the specification of the 011 patent, in two separate places, we know that the particles that we care about, the abrasive particles that we care about, have to be in contact with the two. This goes to the issue of how much abrasive material you actually need and whether the district court violated the doctrine of claim differentiation. Our view is that... Being in contact with the tooth and actually abrading that tooth are two different questions, aren't they? Well, I don't think so, Your Honor. I mean, the argument I think we heard here is that the term plaque-removing member was specifically defined by the patentee to not require that it remove plaque, which I think in light of the description in the patent... No, you just said that you don't have to have abrasion to remove plaque. However, here, you have a plaque-removing member and the only difference between the thermoplastic element that is described in ASHER and the thermoplastic element that it specifically discusses in the prior art is ASHER saying, I've put abrasive into that thermoplastic element to remove plaque. Yeah, but you're assuming, are you not, Mr. Callahan, that the invention is effective to do something? I think we presume that... That goes to the question of validity, not infringement, doesn't it? I don't think so, Your Honor. I think in terms of claim interpretation here, the first step, we know that it is the abrasives that have to do the plaque removal. We see in two different places, in column two, lines 10 through 12, and again, in column three, lines 38 through 40.  He says, if you don't want to just mix the abrasive homogeneously in with the thermoplastic material, the thermoplastic elastomer, but you want to get the same effect using less abrasive, he says, just embed the abrasive on the external edges of the thermoplastic elastomer projection and you'll get the same effect. So, we know that when he's describing his invention, he is describing something in which the abrasives must actually abrade. And, Your Honor, to go to a question you asked, we do not agree that on this record there is evidence that the materials that are in the accused product actually cause abrasion. We disagree with that. In fact, the evidence that was... That wasn't my question. My question was, do you agree that on this record that your product has abrasive material in it? Whether or not it causes abrasion is the $64,000 question, but there are abrasive materials in it. And on that point, Your Honor, there is titanium dioxide in there, there is silicon dioxide. The evidence at summary judgment was that those in the sizes in which they exist, the particle sizes in which they exist, and the concentration in which they exist, they are not abrasive. Well, that goes to the question of infringement, though, right? It does, Your Honor. And on that issue... But it also goes to the question of discovery, does it not? And the eventual production of the data that abrasiveness was measured by Colgate? Well, yes, Your Honor. And if you'd like me to address that, I'll do that now. It's an extraordinarily difficult question if you try and preserve the equality between the parties in litigation to deny discovery of information that seems to be directly... Well... ...be more directly involved with the very issue on which they were dismissed. As the district court pointed out, Your Honor, this is at A753, this evidence that is alluded to or talked about by the plaintiffs in their brief was largely favorable to Colgate. And the question... That still doesn't excuse the fact that you didn't, that you, well, the magistrate judge didn't want to say you lied, but said it was worse than a misrepresentation. Said it was wrong and you knew it was wrong. That's right. Said it should have been produced. And pretty close to lying. And then... And sanctioned you for it to the extent that you could. But what my problem is, if you look at the timeline, you've got, all you do is drop a footnote saying, oh, this report's late. But in the meantime, you're before the magistrate judge who says, look, one of the reasons I'm not sanctioning Colgate worse for this really bad conduct is because I would have given them more time if they needed it, but they've already gotten their report in, so it's not a big deal, so there's not as much prejudice. And then the district judge, apparently unaware of this whole exchange before the magistrate, based solely on a footnote, excludes the report as untimely. I mean, in fairness, would you have thought that that kind of footnote, in the face of all that discussion you're having with the magistrate, would actually constitute a motion to strike? Well, let me step back from that, Your Honor. I think there were numerous opportunities. When we're examining whether the district court abused its discretion in saying a report that was filed unquestionably late by at least a month, probably two months since it's not really a rebuttal report, when it was filed there was no request saying, look, we're tied up in this other thing and we'd like permission to file this report late. Or, Your Honor, we're tied up in this other thing, either directed to the magistrate judge or the district court judge. We need more time to put in additional evidence. But that whole discussion was had. I read the whole transcript before the magistrate judge. She was very disturbed about what you all did, but she said, look, it's all water under the dam now because by this point they've already gotten their report in. I mean, at that point, do you really think that it was fair to the other side to assume that a footnote that predated that whole discussion somehow was your motion to strike? Well, I don't think we were required, Your Honor, to file a motion to strike something that comes in after a deadline with no request for an extension of that deadline. They neither sought permission to file it late, nor did they seek excuse for having filed it late in the summary judgment briefing. And I think the more important question, Your Honor, is what's in that report, right? The exchange with the magistrate judge is all about Asher saying, we need to do more testing. We've got this testing now. We need to do more testing. That is the complete upshot of what Asher is asking for. Well, if you look at the PUT report, there's no testing. They didn't do any testing. They have never done any testing, neither Dr. Asher nor Mr. Newman, I'm sorry, it's the Newman report that's the late one, nor Mr. Self. No one ever did any testing. And both Dr. Asher and Dr. Self said, the only way one can know whether this actually has an abrasive effect, an actual abrasive effect as opposed to a theoretical one, is by testing. And what they were asking the magistrate judge for was, let us do testing. Please let us do testing. Please let us run counter-testing. And they never did it. That's not the evidence that we're talking about. What we're talking about is one more person coming in and saying, this is theoretically abrasive, adding really nothing more. That goes to Judge Newman's point, which is that all of that evidence with regard to what your titanium toothbrushes do is the sort of thing that one would develop in discovery. Right? That's right, Your Honor. And they'd get the opportunity to do their testing. That's right. And that would preclude summary judgment.  So they had two separate experts in this case, Your Honor. They knew what our theories of claim construction and non-infringement were from the very outset of the case. They had a full, fair, and complete opportunity to do testing during the period of discovery, to ask that discovery be extended if they felt there was some reason to do that to get additional testing. How long was the period of discovery? Over a year, Your Honor. And the period for expert discovery was extended at least one time for disclosure of expert reports. And at what point during that year did Colgate say that, yes, we did do abrasive testing after all? It was toward the end, but not beyond the end of that period, Your Honor. When you submitted your expert report with the test. That's correct, Your Honor. That's right. So for months, four or five months, you're saying, nope, nobody's ever done any testing. And then you submit a report with all this testing that predates that answer. We submitted an expert witness report. The expert was specifically retained, as experts are in every case, to do testing. That testing was disclosed in connection with the expert report that he filed. And ASHER had the opportunity and took advantage of the opportunity to provide rebuttal expert witness reports. But there's a difference between knowing for five months during discovery that testing's going on and that you're going to be, you might need to respond to testing, and then finding out at the end of discovery that, oh, yeah, all that time we said there was no testing, we were actually testing the whole time, or even before that. Our experts were testing, is it not? And you knew it, and you said no. You didn't say, this is work product. You didn't say that we're not going to turn this over. We're going to ask for permission. You said no. That's right. And the issue of that issue was squarely in front of Magistrate Judge Tafoya, without question, and her ruling is what her ruling is. But what ASHER... That you engaged in sanctionable conduct. And we were sanctioned for what we were sanctioned for. And Magistrate Judge Tafoya certainly indicated that if you want to do testing ASHER, she would be amenable to a request to do testing. Rule 56F, Your Honor, also, at summary judgment, if you want to come in and say we can't respond to this right now, we need the opportunity to do testing, which they still hadn't done and have never done, they have the opportunity to do that. So the question is whether having not sought any specific relief from Magistrate Judge Tafoya to extend the schedule or to allow them to do testing, which they didn't do in any event, to not asking for any amendments to the scheduling order, to not asking for permission to file an expert report late, and to taking the only place where they addressed this motion or this issue, Your Honor, is in their motion for reconsideration of the judge's summary judgment order, which they had to withdraw and not allow the district court to rule on and further utilize its discretion here so that jurisdiction before this court would be proper. Speaking of jurisdiction before this court, what happened to your counterclaim? I believe it was, let me just take a look, Your Honor. I believe it was dismissed. Yeah, well, we can't find that anywhere. We see a final judgment that says the case is over. There's nothing in the docket where we see you dismissing your counterclaim or the judge dismissing your counterclaim. When a counterclaim for invalidity is pending, a DJ counterclaim, how do we have jurisdiction? I don't think that issue was addressed here, Your Honor, but I'm not sure. I don't know whether ours was by virtue of a counterclaim or an affirmative defense. If it was a counterclaim, on this record, it doesn't look like it was dismissed. Can you submit something to the court that tells us whether or not those counterclaims were ever dismissed, and if so, shows us where in the record that's reflected? Yes, Your Honor. Okay. Thank you, Mr. Callahan. Thank you, Your Honor. Let's see, Mr. Cochran. On occasion, the court does read limitations from the specification into the claims, and for good reason. They use clear claim construction rules for doing that. Here, we've got a situation where this wording came out of nowhere. There's nothing in the specification. There's nothing in the claims. This whole idea of having sufficient quantities and the proper disposition and the last merit material, that came out of thin air, and now it's essentially being read into Claim 1, and I say that's improper. Now, wouldn't you have an obviousness problem if we read the claim as you want us to? I don't think so, and no evidence has been presented. Well, I mean, in your own patent, you described the prior art as simply having a last merit material, and you say that's not good enough. Doesn't that imply that something you add must actually have some benefit? Yes, but again, and as said specifically, in the specification, the invention provides a toothbrush. This is a combination, a toothbrush for cleaning human teeth and removing plaque, and it's the combination of the bristles, the location of the bristles surrounding the last merit material, the elastomeric material, and the abrasives in it. But we have a lot of case law that says if you add something to the prior art that is essentially meaningless, that has no impact on the invention, that therefore that additional limitation is meaningless. Well, this combination has not been shown. There's no prior art that shows an elastomeric material that's surrounded by bristles, and the elastomeric material having abrasive particles. There's no prior art that shows that combination. Okay. Thank you, Mr. Cochran. We'll hear from Mr. Hadfield. We have a few minutes. Thank you, Your Honors. I'd like to briefly address the content of Dr. Newman's report because what I hear from Colgate is that even if you let Dr. Newman's report in, Dr. Asher has failed to meet his burden. There is no testing in his report. Your Honor, but he did note that the particles were definitely abrasive, definitely abrasive, directly from his report. The particles of what? Of titanium dioxide, of calcium oxide, of silicon dioxide, which are contained in the polishing star. There's really no dispute that they're actually contained in relatively high quantities. If you look at the Fourier testing that was done on them, they are the vast majority, I think almost 92% of the noncombustible material. Did that report add anything to what was already in the record as a result of the earlier expert testimony and the rest of it? It did, Your Honor, and it directly addressed Dr. Putt's report. I know that the district court has characterized Dr. Newman's report as not or possibly not a rebuttal, but it does directly address Dr. Putt's report and rebut it and state that, no, there is abrasion. So we ask clearly for the inclusion of Dr. Newman's report. I'd also like... There were a lot of good procedural arguments. I mean, I understand that there were some problems on the other side, but two wrongs don't make a right. I mean, you didn't file a 56-F. You didn't file a motion asking to have the report accepted late, even when the magistrate judge said, if you need more time, tell me what you need. You didn't at that point say, we need to have you expressly allow this report. Why didn't you do any of that? Well, Your Honor, Dr. Asher was under the impression that by orally requesting this at the hearing before Magistrate Tafoya that this had been granted, Magistrate Tafoya specifically says, I'll give you more time if you're asking for it, and counsel for Dr. Asher, Mr. Fisher, said, yes, I am. And it's included in our brief. He specifically requested more time. I think, as you also pointed out, Dr. Asher was caught off guard here, and timing is everything in relationship to Dr. Newman's report. We find out that Colgate has retained Dr. Putt in September 2010. In January 2011, Asher submitted interrogatory number eight, asking if there had been any testing done. So January. Colgate received an extension to reply to that until March 25th, 2011. Dr. Putt finished his report on March 15th, 10 days before the response was due. But if it's the fact of testing that they should have told you about, why isn't it important that Newman's report doesn't do any testing? I mean, if that's really what you were surprised by, then you would think that the response of report would be, we'll test. Your Honor, there's a previous report done by Dr. Newman, which he analyzed the brush and its effect versus other brushes. There are problems with that report. So what Dr. Newman did is draw upon his experience in the, I think, 1999 expert report that he did for his report in this case. And we found Dr. Newman's report to be adequate to prove abrasivity. And that's why we rested on that report. Okay. Thank you, Mr. Haskell. Thank you all. The case is taken.